**Julia COLYER, Plaintiff,**

v.

**Patricia HARRIS, Secretary of Health and Human Services, Defendant.**

**No. C–3–79–267.**

United States District Court, S. D. Ohio, W. D.

July 31, 1981.

Steven B. Horenstein, Legler, Lang & Kuhns, Dayton, Ohio, for plaintiff.

Joseph E. Kane, James E. Rattan, Asst. U. S. Attys., Columbus, Ohio, for defendant.

DECISION AND ENTRY OVERRULING DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION OF MAGISTRATE BASED UPON THEORY THAT MAGISTRATE'S ACTIONS ARE TANTAMOUNT TO GRANTING OF A DEFAULT JUDGMENT; MAGISTRATE'S REPORT REJECTED IN ITS ENTIRETY; PLAINTIFF'S AND DEFENDANT'S CROSS MOTIONS FOR SUMMARY JUDGMENT OVERRULED; CASE REMANDED TO DEFENDANT FOR FURTHER PROCEEDINGS; TERMINATION ENTRY

RICE, District Judge.

I. *Introduction*

This matter is before the Court pursuant to Defendant's Motion, under 28 U.S.C. § 636(b)(1)(C), seeking Court review of the Magistrate's Recommendation that Plaintiff's Motion for Summary Judgment be granted. Defendant has filed a Memorandum in Support of her Motion, maintaining that adoption of the Magistrate's recommendation would constitute the entry of a default judgment in violation of Fed.R. of Civ.Pro. 55(e).

28 U.S.C. § 636(b) provides for various types of references by a judge to a magistrate. § 636(b)(1)(A) indicates that a magistrate may determine any pre-trial matter, with certain listed exceptions, and that reconsideration by the judge of such matters is limited to cases where the magistrate's order is shown to be clearly erroneous. § 636(b)(1)(B) specifies that, in other matters, including those motions excepted in § 636(b)(1)(A), the Magistrate may submit

to the judge proposed findings of fact and recommendations for disposition. With regard to this latter category of references, § 636(b)(1)(C) authorizes the Court, upon objection by a party, to conduct a de novo determination of those portions of the report to which objection is made. Subsection C further allows the Court to accept, reject, or modify, in whole or in part, the findings of the Magistrate. Finally, in § 636(b)(2), the Court is empowered to appoint a Magistrate, with the consent of the parties, to serve as a special master in any civil case.

As the present case involves a motion for summary judgment, which is specifically excepted in § 636(b)(1)(A), the reference herein is governed by § 636(b)(1)(B). As indicated above, the Court is required to conduct a de novo review of those portions of the Magistrate's report to which objections have been made. In addition, the Court may accept, reject, or modify, in whole or in part, the recommendations or findings made by the Magistrate.

As Defendant has requested a de novo review of the entire record, the Court has carefully scrutinized the administrative transcript to determine whether substantial evidence to support the Secretary's decision is contained therein. Based on this review, the Court has concluded that the Magistrate's Report must be rejected, but not for the reasons advanced by Defendant. The Court has indicated its belief, in other recent cases, that the technique utilized by the Magistrate was not improper and did not recommend the entry of a default judgment. *Estes v. Secretary of Health and Human Services*, 512 F.Supp. 1106 (1981). However, the Court has determined that the within matter must be remanded to the Secretary because the evidence of record is not adequate to permit an assessment of the decision of the Administrative Law Judge (hereinafter ALJ). In addition, the opinion of the ALJ is confusing, and must be clarified in order for the Court to correctly exercise its power of review. For these reasons, the Court declines to address Defendant's objections, but will rather analyze the manner in which the current record is defective. Following this discussion, the Court will then consider what effect should be given on remand to the amended regulations which are contained in 20 C.F.R. §§ 416.901 et seq., and which became effective on February 26, 1979, subsequent to the ALJ's decision in the present case.

II. *Procedural History*

The record indicates that Plaintiff Julia Colyer filed her claim for Supplemental Security Income benefits on May 9, 1978. After denial of that claim, she requested reconsideration alleging that she could not work due to dizziness and pain in her feet. Upon reconsideration, the denial was affirmed, and Plaintiff then requested a hearing. On December 27, 1978, a hearing was held before an Administrative Law Judge, before whom Plaintiff appeared without an attorney. On January 26, 1978, the ALJ issued his decision, finding that Plaintiff's impairments did not prevent her from engaging in substantial gainful activity; thus, benefits were denied. Plaintiff then requested that the ALJ's decision be reviewed by the Appeals Council. On July 3, 1979, the Appeals Council affirmed the decision of the ALJ. In particular, the Council applied the new Social Security regulations which had become effective on February 26, 1979, and found that Plaintiff possessed the residual functional capacity to return to her former employment as a kitchen helper.

Plaintiff then filed her complaint with this Court, and on November 20, 1979, filed her Motion for Summary Judgment. In the Memorandum attached to that Motion, Plaintiff contended that the ALJ's decision denying disability was not supported by substantial evidence in the record. Additionally, Plaintiff maintained that an application of the new "Grid Regulations" adopted on February 26, 1979, would direct a finding of disability. On February 4, 1980, after the Secretary had failed to file a motion for summary judgment, the Magistrate issued his recommendation that Plaintiff's Motion for Summary Judgment be granted.

As previously noted, in light of the Court's conclusion that remand is required, there is no need to address questions raised concerning the sufficiency of the Magistrate's Report, i. e., whether the Magistrate's recommendation would constitute the granting of a default judgment. Accordingly, the following issues are seen as pertinent to the disposition of the within matter: (1) whether the record contains substantial evidence to support the ALJ's determination that Plaintiff could engage in substantial gainful activity, and (2) the proper application of the newly adopted Social Security regulations to actions pending prior to February 29, 1979.

### III. Sufficiency of Evidence Supporting the Secretary's Decision

In reviewing the decision of the Secretary, the Court is mindful of the limited scope of review permitted by 42 U.S.C. § 405(g), which provides that "the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Courts, in interpreting the meaning of this standard, have uniformly followed the statement of the Supreme Court in *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), that substantial evidence is:

[m]ore than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).

*Id.* at 401, 91 S.Ct. at 1427. Accordingly, the inquiry here is whether the record contains relevant evidence adequate to support the ALJ's conclusion that Plaintiff possessed the residual ability to engage in "medium" work and to perform her former employment as a "kitchen helper" at Ponderosa.

After a careful scrutiny of the entire record, the Court has concluded that there is presently no adequate basis for assessing the sufficiency of the administrative decision. Specifically, the Court has determined that the record is deficient in the following areas:

(1) The failure of the ALJ to define "medium" work;

(2) The failure of the ALJ to relate medium or light work to specific jobs, and to analyze those jobs in relation to Plaintiff's age, education and work experience;

(3) The failure of the ALJ to specify whether Plaintiff's former employment constituted medium work, and if so, why her employment could be so categorized;

(4) The failure of the ALJ to develop evidence at the hearing, in regard to:

(a) exertional requirements of Plaintiff's work at Ponderosa;

(b) the manner in which Plaintiff's daily activities were restricted by her impairments.

The Sixth Circuit Court of Appeals, in *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978), criticized the use of phrases such as "light work," by stating that:

A finding of capacity to do light work does not constitute evidence that a person can engage in substantial gainful activity, nor is such a finding sufficient to rebut a prima facie case of disability. A claimant's capacity to perform work must be evaluated in light of *his* age, *his* education, *his* work experience, and *his* impairments, including *his* pain. This requires a finding of capacity to work which is expressed, not in terms of a vague catchall phrase such as "light" work, but in terms of specific types of jobs.

*Id.* at 362–63 (Citations omitted). Further, in *Massey v. Celebrezze*, 345 F.2d 146 (6th Cir. 1965), the Court stated, in regard to the use of the phrase "light work," that what "light work consists of must be specified." *Id.* at 157. Although the decisions cited referred to "light" rather than "medium" work, the reasoning is equally applicable to the use of the phrase "medium work." Thus, since the ALJ failed to define "medium" work or to relate it to specific jobs, his decision must be viewed as inadequate.

Additionally, the ALJ's conclusion that Plaintiff could perform "medium" work is inexplicable in light of the evidence of rec-

ord, or perhaps more appropriately, the lack of evidence. For purposes of this portion of the analysis, the Court will assume that the ALJ's reference to "medium" work coincided with the definition of that phrase in the new regulations which became effective on February 26, 1979. There, "medium" work was defined as entailing "lifting 50 pounds maximum with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 910. Given this definition of "medium" work, the Court has difficulty with any finding that this Plaintiff could perform such activities, at least in view of the current state of the record.

Plaintiff is a fifty-seven year old woman who is five foot, one inch tall, and who weighed two hundred thirty-one pounds at the time of her hearing (T. 35). In addition, Plaintiff suffers from moderate hypertension, and from arthritis in her feet and hands (T. 99, 112). The arthritis in Plaintiff's feet is evidenced by "tenderness of the MTP joints," "joint abnormalities," and "swelling at the junction of her malleoli and talus, both medially and laterally" (T. 99). Also, Plaintiff has claimed that standing on her leg for even three hours causes severe pain and swelling (T. 70, 71). Given the above evidence, the Court questions whether Plaintiff could even lift fifty pound objects, and in addition, whether she could lift and carry 25 pound objects frequently without greatly jeopardizing her health. Consequently, on this basis alone, the case must be remanded for further evidence of the medical effect of Plaintiff's impairments upon her ability to lift and carry objects on the daily basis required in a work situation. Moreover, additional evidence must be secured concerning the exertional requirements of the Plaintiff's last employment, as no conclusion can rationally be made regarding her ability to return to that job without some awareness of the physical demands involved. Further, the Court questions how any rational assessment of Plaintiff's capacity for work can be made without specific evidence concerning Plaintiff's daily activities. Thus, additional evidence must be obtained in this regard, also.

Finally, as indicated in *Hephner, supra,* 574 F.2d 359 (6th Cir. 1978), Plaintiff's remaining capacity must be analyzed in terms of her age, education, and work experience. Although the ALJ noted summarily that Plaintiff possessed "the residual capacity considering her age, education, and work history to engage in work such as a kitchen helper," (T. 18), this statement fails to analyze, in a reasoned fashion, the actual effect of Plaintiff's age and education (which are classified respectively by the current regulations as "advanced" and "limited," 20 C.F.R. §§ 416.906, 416.907), upon Plaintiff's ability to work. Accordingly, the ALJ's decision, on remand, should correct this error by providing an adequate evaluation of the effect of these factors on Plaintiff's residual capacities.

Because of the inadequacy of the record, and the failure of the ALJ to specifically articulate the phrases used, and the factors involved in his decision, the Court has concluded that the matter must be remanded for further presentation of evidence as outlined above. Because of the possibility of the application of the recently adopted regulations upon remand, the Court now turns to a discussion of the proper effect to be given to those regulations in a case such as the present, which was pending prior to their effective date.

## IV. *Retroactivity*

As noted above, the Social Security Administration has recently published medical-vocational regulations, which are to be applied in the determination of disability claims. These regulations, effective February 26, 1979, are contained in 20 C.F.R. §§ 416.901 et seq., and provide a sequential analysis for the disposition of claims. Although Plaintiff's application for benefits was filed and decided by the ALJ prior to February 26, 1979, the Appeals Council utilized the regulations in concluding that Plaintiff retained the residual functional capacity to return to her former employment as a kitchen helper (T. 3). Moreover, the ALJ's decision anticipates the language of the regulations in its use of terms such

as "residual capacity," "light work," and "medium work" (T. 17). Consequently, although Plaintiff has not raised the issue of retroactivity, the Court feels compelled to address the question of whether the medical-vocational regulations contained in 20 C.F.R. §§ 416.901 et seq. may be properly applied to disability claims which were pending prior to the effective date of those regulations.[1]

In *Greene v. United States*, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964), the Supreme Court refused to apply an administrative regulation retroactively where to do so would deprive a party of rights matured under a prior regulation. The Court stated that:

> [T]he first rule of construction is that legislation must be considered as addressed to the future, not the past ... [and] a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be "the unequivocal and inflexible import of the terms, and the manifest intention of the legislature."

*Id.* at 160, 84 S.Ct. at 621–22 (citations omitted). Subsequently, the Supreme Court, in *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), affirmed this principle as applied to private cases between individuals, but noted that where great national concerns were involved, courts should apply the law in effect at the time of decision unless to do so would create manifest injustice. *Id.* at 282, 89 S.Ct. at 526. In *Bradley v. School Board of the City of Richmond*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974) (*Bradley*), the Supreme Court further refined this concept by indicating that a change in the law could be given effect in a pending case even though the legislature had not clearly intended

such an effect. *Id.* at 715, 94 S.Ct. at 2018. The converse would be true, however, said the Court, in cases of manifest injustice, and "where Congress has expressly provided, or the legislative history had indicated, that legislation was to be given only prospective effect." *Id.* at 715, n.21, 94 S.Ct. at 2018, n.21. Accordingly, the questions to be now addressed by the Court are: (1) whether Congress has expressly provided, or the legislative history of the regulations has indicated that 20 C.F.R. §§ 416.901 et seq. is to be given only prospective effect, and if not, then; (2) whether the retrospective application of those regulations would constitute a manifest injustice.

In regard to the first inquiry, the Court concludes, not without struggle, that the retroactive use of the medical-vocational regulations was not expressly forbidden either by Congress or by the Social Security Administration. The comments accompanying the publication of 20 C.F.R. §§ 416.901 et seq. in the Federal Register do not express specific intent concerning prospectivity, beyond the mere fact that the effective date of the regulations was delayed for a period of three months after publication. However, the unspoken assumption, as evidenced by the use of the regulations herein by the Appeals Council, may have been that the rules would be applied to all cases pending before the Social Security Administration on February 29, 1979, regardless of the filing date of those claims.

Any such intent, even if present, would be overruled by the provisions contained in the Administrative Procedure Act, as that statute governs the actions of administrative agencies such as the Social Security Administration. 5 U.S.C. §§ 500(a)(1), 551(a) (1970).

5 U.S.C. § 551(4) (1970) defines rule as:

---

**1.** Additionally, this issue is deemed particularly relevant in light of the possibility that like retrospective application of the regulations were made in other cases pending before the Social Security Administration prior to February 26, 1979. Because of the Court's awareness of the substantial delays generally encountered in Social Security benefit cases (as evidenced herein by the fact that Plaintiff's claim, filed in 1978,

is reaching court disposition almost three years later), the possibility referred to is more than merely speculative. Accordingly, resolution of the proper application of the regulations will facilitate subsequent decisions of this Court, will guide the Secretary in actions currently pending in the administrative process, and, finally, may avoid the necessity of remanding significant numbers of cases in the future.

[T]he whole or part of an agency statement of general or particular applicability and *future effect* designed to implement, interpret, or prescribe law or policy.

At first blush, a plain reading of this statute would seem to indicate that rules adopted by an administrative agency are to be accorded only future, or prospective effect; thus, *Bradley*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974) would compel the conclusion that 20 C.F.R. §§ 416.901 et seq. could not be applied to cases pending before the effective date of those regulations. This clear expression seems to be dispositive, and the Court has only been convinced otherwise by the failure of other courts to reach similar conclusions, and through an examination of the legislative history of the Administrative Procedure Act. A thorough perusal of all relevant authority has failed to yield another decision reaching an interpretation of "future effect" similar to that advanced above. What is ever more surprising is the failure of any court to even consider the meaning of that term. Although these factors are not in themselves dispositive, the Court is additionally convinced, albeit reluctantly, by the legislative history surrounding the Administrative Procedure Act. That history indicates a long-standing Congressional concern with the tendency of administrative agencies to function as both prosecutor and judge. H.R.Rep.No.1980, 79th Cong. 2nd Sess., reprinted in [1946] U.S.Code Cong. & Ad. News 1195. In addition, the use of the term "future effect" in 5 U.S.C. § 551(4) has been characterized as an attempt to clarify the distinction between rule-making and adjudication. B. Schwartz, *Administrative Law*, 143–47 (1976). According to Schwartz, "the key factor in determining the *nature* of an agency determination is 'future effect.'" *Id.* at 145 (emphasis added). Further, he indicates that although a decision may appear to be traditionally adjudicatory insofar as it operates upon a party in his individual capacity, the process may be classified as rule-making so long as its effect is prospective. *Id.* at 144–45.[2]

**2.** Schwartz's analysis is borne out by the legislative history of the Administrative Procedure Act. The original proposal on Administrative procedure, the Walter-Logan Bill, was introduced during the 76th Congress in 1939 but was vetoed by President Roosevelt because a report had not yet been received from a committee which had been appointed to study the administrative procedure problem. 92 Cong. Rec. 2148 (1946). During the course of debate on a later administrative procedure bill introduced in 1945, and eventually adopted in basic form as the Administrative Procedure Act, Senator McCarran indicated, in response to an inquiry regarding the difference between the present act and the Walter-Logan Bill, that:

> The definitions of the Walter-Logan bill were imperfect and confusing. Rules were so defined as to include "orders" and were limited to interpretations of terms of statutes. That bill, therefore, failed to distinguish between substantive, interpretative, and procedural rules.

92 Cong.Rec. 2155 (1946) (statement of Sen. McCarran).

As originally approved by the Senate in 1945 as S.7 [with an identical resolution under consideration by the House as H.R. 1203. 93 Cong.Rec. 2165 (1946)] and sent to the House of Representatives, the definition of "rule" in § 2 of the proposed Administrative Procedure Act was as follows:

> "Rule" means the whole or part of any agency statement of general applicability designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of any agency.

On the Subject of Administrative Procedure: Hearings on H.R. 184, H.R. 339, H.R. 117, H.R. 1203, H.R. 1206 and H.R. 2602. Before the House Committee on the Judiciary, 79th Cong. 1st Sess. 110 (1945) (Committee Hearings). After hearings on the Act had been held by the House Judiciary Committee, the above definition was amended by the Judiciary Committee, to a form which is identical in all relevant aspects, to 5 U.S.C. § 551(4) (1970) as it appears today. In particular, "rule" was defined as "the whole or any part of any agency statement of general or *particular* applicability and *future effect*." H.R.Rep. 1980, 79th Cong. 2d Sess. 49 (1946) (added language emphasized).

The motivation underlying the above amendments is explained by the comments of the House Judiciary accompanying the final amended version of S.7, *id.*, at 49, n.1, and by testimony received by the House Judiciary Committee during its hearings on the Administrative Procedure Act. A member of the Interstate Commerce Commission, Mr. Aitchison, testified before the Committee, and in his remarks evidenced some confusion with regard to the definitions of "rule" and "rule-making." *Committee Hearings*, 79th Cong. 1st Sess. 77

Based on this analysis, and that contained in footnote 2, then, the Court concludes that the phrase "future effect" was added by Congress to 5 U.S.C. § 551(4) in an attempt to distinguish between rule-making and adjudication, rather than being intended to bar retrospective application of rules as a matter of course.

This conclusion, however, still leaves for resolution the question of whether retroactivity is prohibited herein by considerations of manifest justice. In *Bradley, supra,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), the Supreme Court identified as follows those criteria material to the determination of manifest justice: "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." *Id.* at 717, 94 S.Ct. at 2019.

With regard to the first category, i. e., the identity of the parties, the Court indicated that injustice might occur where there existed a disparity in the ability of the parties to protect their respective interests. *Id.* at 718, 94 S.Ct. at 2019. Although the Social Security Administration has dismissed any notion that the new regulations would confuse or mislead claimants [*See* comments accompanying the publication of 20 C.F.R. §§ 404.1501 et seq. and §§ 416.901 et seq., 43 Fed.Reg. 55349 (1978)], the Court is not convinced by this contention, particularly in view of its own difficulty with the interpretation of the regulations. Furthermore, a Social Security benefits claimant could not generally be considered to be in parity with the Secretary, especially where as here, the applicant was not represented by an attorney, and more likely than not, had no awareness that the regulations even existed.

With regard to the nature of the right involved, the Supreme Court in *Bradley* stated that an intervening change in law should not be applied to divest a "matured or unconditional" right. 416 U.S., at 720, 94 S.Ct., at 2020. Certainly, the right of an applicant for Social Security benefits could not be classified as unconditional, since the right to receive those benefits has not yet arisen. Further, given the restricted protection afforded by the Supreme Court to the private property interest of a Social Security claimant in benefits awarded and

(1945) (statement of Mr. Aitchison). First, Aitchison pointed out that rate-making, a Commission activity, had been included within the definition of "rule" and "rule-making," at least in S.7. *Id.* at 78. However, in reviewing the reasonableness of a rate in a particular case, Aitchison pointed out that the Commission would be acting in a quasi-judicial manner insofar as it evaluated past conduct, but would be performing a legislative (or rule-making) act to the extent that the rule of that case would be taken advantage of by other parties in the future. *Id.* at 78. Aitchison then asked that the Committee clarify whether in such cases, the action would be adjudication, rule-making, or rate-making. *Id.* at 78. The Chairman of the Committee ended by asking Aitchison to later submit to the Committee his suggestions of how the language of the bill might be amended for better clarification.

Although the Court has been unable to find the text of any language changes presented by Aitchison to the House Judiciary Committee, or to ascertain whether in fact he did submit any proposals, the presence or absence of such discovery is not important, for the Judiciary Committee comments accompanying the final proposed amendments to the Administrative Procedure Act are a clear response to the concerns expressed by Aitchison. H.R.Rep. 1980, 79th Cong., 2d Sess. 49 (1946). The definition of rules, as noted earlier, had been altered by the addition of "particular," to modify applicability, and by the insertion of "future effect." *Id.* at 49. In a footnote, the Committee made the following statement:

> The change of the language to embrace specifically rules of "*particular*" as well as "general" applicability is necessary in order to *avoid controversy* and assure coverage of rule making addressed to named persons . . . . The phrase "future effect" does not preclude agencies from considering and, so far as legally authorized, *dealing with past transactions in prescribing rules for the future.*

*Id.* at 49, n.1 (emphasis added).

The above analysis has indicated that the phrase "future effect" was specifically inserted within the definition of "rule" to clarify the distinction between adjudication and rule-making, as Schwartz suggests in his analysis, and to assuage concern over potential confusion of these two agency functions. Thus, it is apparent that Schwartz's conclusions are correct, and that rule-making may, consistent with legislative intent, operate retroactively.

subsequently terminated prior to hearing, *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1975), the nature of the right asserted by Plaintiff herein cannot be viewed as being particularly significant.

However, the lack of effect of the above portion of the *Bradley* analysis is balanced by the nature of the impact of the change in the law upon such rights as Plaintiff does possess. Although the Social Security Administration has indicated that the new regulations merely reflect existing policies, 43 Fed.Reg. 55355 (1978), this theory is contradicted by later statements contained in the comments accompanying the publication of the new regulations. 43 Fed.Reg. 55349 (1978). For example, in response to complaints received during the comment period, to the effect that the proposed age regulations were arbitrary, the Social Security Administration stated that:

> We acknowledge that there are no conclusive data which relate varying specific chronological ages to specific physiologically-based vocational limitations for performing jobs; *this was a pioneering effort by SSA due to the unique nature of its disability program.*

43 Fed.Reg. 55359 (1978) (emphasis added).

Moreover, the theory that the new regulations only codify existing practices is further undermined by a comparison of those regulations with the rules formerly in effect. Perhaps the most significant alteration can be seen in the adoption of the rules contained in 20 C.F.R. Subpart 1., App. 2. These rules take administrative notice of various unskilled occupations which exist in the national economy (without specifying any particular jobs) and then, depending on the age, vocational experience, and education of a particular applicant, direct a finding of "disabled" or "not disabled." Although the Secretary is permitted to take administrative notice of the existence of various jobs in the national economy, she has not been allowed to take notice of facts which are complicated and disputed. *Taylor v. Weinberger*, 512 F.2d 664 (4th Cir. 1975); *O'Banner v. Secretary of Health, Ed. and Welfare*, 587 F.2d 321 (6th Cir. 1978).

Because the newly-adopted regulations now may permit the Secretary to circumvent vocational testimony regarding specific skills possessed by a claimant, or to avoid a reasoned analysis of a particular claimant's capacities, they may violate the congressional mandate for individualized case-by-case determination of disability claims. *Taylor*, 512 F.2d at 668.

Although the Court makes no comment regarding any potential substantive defects of 20 C.F.R. § 416.901 et seq., the foregoing discussion does indicate that to allow retrospective application of the regulations contained therein would constitute a manifest injustice, due to the lack in parity of the parties, and to the potentially adverse impact of the regulations upon the rights of those involved. Because the right involved does not rise to the level of an unconditional claim, however, some degree of retroactivity may be in order. Other courts which have addressed the issue of the retrospective effect to be given to 20 C.F.R. §§ 404.1501 et seq. and §§ 416.901 et seq. have reached varying conclusions. In *Hicks v. Califano*, 600 F.2d 1048 (4th Cir. 1979), the Court cited the *Bradley* case, and without further discussion, stated that the new regulations would be applied to the case at hand, which was pending at the time of the adoption of the amended regulations. *Id.* at 1050. In *Stallings v. Harris*, 493 F.Supp. 956 (W.D.Tenn.1980), the Court cited the *Hicks* decision, and then summarily stated that the regulations would be applied retroactively because they merely consolidated and elaborated upon existing practices. *Id.* at 957, n.2. This Court has already indicated its belief that the regulations deviate distinctly from previous practices, and therefore, the result reached by the *Stallings* court must be rejected on that ground alone. Additionally, however, the conclusions of both of the above cases cannot be accepted because of the failure of either court to adequately articulate the rationale underlying its decision to accord respective effect to the regulations.

In *White v. Califano*, 473 F.Supp. 503 (S.D.W.Va.1979), the Court held that the

newly adopted Social Security regulations could be applied retroactively to cases filed prior to February 26, 1979, only to the extent that such use did not result in a decision contrary to that which would have been reached prior to adoption of the rules, or where the use would benefit the claimant. This approach is harmonious with the remedial purpose of the Social Security Act, *Ziskin v. Weinberger*, 379 F.Supp. 124 (S.D. Ohio 1973), in that the amended regulations are not permitted to work to the detriment of a claimant. The method adopted in the *White* case also comports with this Court's conclusion that retroactivity should be limited in some manner to offset the impact of the changes in law produced by the new regulations. Accordingly, the Court finds that 20 C.F.R. §§ 416.901 et seq. may be applied to cases filed with the Social Security Administration prior to February 26, 1979, only to the extent that they do not produce a result contrary to that which would have been achieved under prior law, or may be applied only if the use of the regulations benefits the claimant. Furthermore, on remand, the ALJ will be required, as specified in *White*, 473 F.Supp. 503 (S.D. W.Va.1979), to "make determinations under both the predecessor practice and the amendments and if the use of the amended rules brings about a decision which is contra to the decision under the prior practice and to the detriment of the plaintiff, to use only the predecessor rule." *Id.* at 506.

V. *Conclusion*

Based on the foregoing analysis, the Court finds that:

(1) Defendant's objections to the Magistrate's Recommendations, based upon a theory that the Magistrate's actions are tantamount to the granting of a default judgment, are not well taken and are overruled;

(2) The Magistrate's Report is rejected in its entirety;

(3). Plaintiff and Defendant's Cross-Motions for Summary Judgment are Denied;

(4) The within matter is remanded to the Secretary for action in accordance with this Memorandum Order.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.